ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL IV**

| | | |
|---|---|---|
| **JOSÉ YAMIR GARCÍA ALICEA**<br>QUERELLANTE(S)-RECURRIDA(S)<br><br><br>V.<br><br><br>**AUTOCENTRO MÁS, LLC;**<br>**COMPAÑÍA DE FIANZA ABC**<br>QUERELLADA(S)-RECURRENTE(S) | **KLRA202400440** | ***REVISIÓN DE DECISIÓN ADMINISTRATIVA***<br>Departamento de Asuntos del Consumidor (DACo)<br><br>Civil Núm.:<br>**CAG-2023-0005216**<br><br>Sobre:<br>Compraventa de Vehículo de Motor |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos.

*Barresi Ramos,* juez ponente.

## S E N T E N C I A

En San Juan, Puerto Rico, hoy día 28 de febrero de 2025.

Comparece ante este Tribunal de Apelaciones, **AUTOCENTRO MÁS, LLC** (**AUTOCENTRO**) mediante un *Recurso de Revisión Judicial* interpuesto el 8 de agosto de 2024. En su recurso, nos solicita que revisemos la *Resolución* decretada el 13 de junio de 2024 por el **DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR (DACO).**[1] En la referida decisión, **DACO** declaró ha lugar la *Querella* incoada el 7 de julio de 2023 por el señor **JOSÉ YAMIL GARCÍA ALICEA** (señor **GARCÍA ALICEA**). Además, dictó la resolución del *Contrato de Compra/Venta* suscrito el 30 de enero de 2023; y le requirió a **PENTAGON FEDERAL CREDIT UNION** (**PENTAGON**) emitir una certificación del balance de cancelación del préstamo incluyendo los pagos realizados con los intereses amortizados. Asimismo, ordenó a **AUTOCENTRO:** (i) satisfacer el balance de cancelación del préstamo a **PENTAGON**; (ii) restituir la cuantía de los desembolsos efectuados a dicha entidad financiera por el señor **GARCÍA**

---

[1] Esta determinación administrativa fue notificada y archivada en autos el 14 de junio de 2024. Apéndice de *Recurso de Revisión Judicial,* págs. 59- 73.

ALICEA; (iii) reembolsar la suma de $1,149.00 (cargo por registro y póliza); (iv) sufragar la cantidad de $2,000.00 por concepto de daños y perjuicios; y (v) desembolsar $1,500.00 por honorarios de abogados a favor del señor GARCÍA ALICEA. DACo prescribió que, una vez fueran ejecutados los saldos, AUTOCENTRO se comunicará con el señor GARCÍA ALICEA para coordinar el recogido del automóvil.

Exponemos el trasfondo fáctico y procesal que acompaña a la presente controversia.

- I -

El 7 de julio de 2023, el señor GARCÍA ALICEA entabló una *Querella* en contra de AUTOCENTRO, PENTAGON y la COMPAÑÍA DE FIANZA ABC, como querellada de nombre desconocido, ante el DACo.[2] Alegó que el 30 de enero de 2023, adquirió un vehículo de motor marca *BMW serie 4*, modelo 2019 en AUTOCENTRO, y alrededor de cuatro (4) meses después, el mismo comenzó a confrontar problemas mecánicos.[3] Como remedio, reclamó la resolución del contrato de compraventa; la compensación de daños y perjuicios; y una determinación de temeridad con la correspondiente imposición de honorarios de abogado.

Así las cosas, el 15 de septiembre de 2023, AUTOCENTRO presentó su *Contestación a la Querella de Autocentro* proponiendo sus defensas afirmativas.[4] AUTOCENTRO negó la mayoría de las alegaciones contenidas en

---

[2] Apéndice de *Recurso de Revisión Judicial*, págs. 1- 27.

[3] Se desprende de la transcripción de la prueba oral (TPO) de la audiencia celebrada el 4 de abril de 2024, que el señor GARCÍA ALICEA declaró que el día 30 de enero de 2023 acudió a AUTOCENTRO para obtener un automóvil:

> R Okey. Compré un vehículo en el concesionario Autocentro Mas, el vendedor me dice que este "dealer" está libre de defectos, que venden autos certificados...
>             [...]
> P Siendo estipulado, Vuestro Honor, estamos hablando del 30 de enero de 2023.
> P ¿Estaba explicando que usted compró un vehículo, y que ocurrió con el vendedor?
> R Me dice que venden autos certificados, libres de defectos, pues confié en su palabra, decidí hacer el proceso de compra, pero meses más tarde se dañó.

Transcripción de la prueba oral (TPO) de 4 de abril de 2024, pág. 11, líneas 23-25; pág. 12, línea 25 y pág. 13, líneas 1-6.

[4] Apéndice de *Recurso de Revisión Judicial*, págs. 28- 32.

la *Querella* y puntualizó que los daños alegados se debían en todo o en parte a la negligencia de terceras personas; el carro objeto de la *Querella* no adolecía de vicios o defectos de diseño, manufactura o ensamblaje; los daños alegados eran altamente exagerados, especulativos e/o imaginarios. Añadió que no incumplieron con su obligación para con los términos de la garantía y los daños se debieron a la falta de mantenimiento y/o cuidado por parte de sus dueños u operadores.

Más adelante, el 2 de octubre de 2023, **DACo** expidió *Citación de Inspección* a realizarse el 6 de noviembre de 2023 a la 1:30 de la tarde.[5] El día 6 de noviembre de 2023, se llevó a cabo la inspección del vehículo concernido en las facilidades de **AUTOCENTRO**. Esta fue practicada por el señor José Torrón Martínez, técnico automotriz del **DACo**. El 16 de noviembre de 2023, se notificó el *Informe de Inspección Vehículo de Motor* (*Informe*).[6] El aludido *Informe* expresa:

> El vehículo lleg[ó] en poder del querellante enganchado en un vehículo de arrastre por plataforma. Este auto aparentaba llevar tiempo varado por la oxidación encontrada en los discos de frenos. Solicité que lo entraran al taller y encontré que tenía la batería de 12 voltios sin carga energética que se encontraba en el baúl. Solicité que le instalaran una porta batería seca para iniciar el arranque del motor y no prendía. El motor se escuchaba con una apariencia de falta de compresión. Este motor no posee una varilla para medir fluidos lubricantes de motor y transmisión automática. También observe la falta de un ducto de (P.V.C. Positive Crankcase Valve) y mostraba en el área humedad de evaporización del fluido lubricante del motor. Solicité la extracción electrónica de un "D.T.C. Diagnostic Trouble Code" y a pesar de la batería estar averiada lleg[ó] a mostrar los siguientes códigos.[7]

La unidad arrojó códigos de diagnóstico que reflejaban problemas de aviso en el panel de instrumentación por falta de fluido lubricante de motor; averías con el motor; "undervoltage" por falta de caudal de corriente viable; falta de batería correcta con una vida útil viable y el motor sufrió

---

[5] Apéndice de *Recurso de Revisión Judicial*, págs. 33- 36.
[6] *Íd*., págs. 37- 45. Dicha *Notificación de Informe de Inspección* incluye apercibimiento sobre el término y manera de presentar las objeciones
[7] Del informe surge que el millaje del automóvil al momento de la inspección era 63,646 millas. Se desprende del *Contrato de Compra/Venta* un millaje de 57,660. Lo cual implica que se recorrieron unas **5,986 millas**.

sobrecalentamiento. Finalmente, opinó un estimado de $102.00 a $130.00 en mano de obra y recomendó la celebración de una audiencia administrativa.

El 28 de noviembre de 2023, el señor GARCÍA ALICEA presentó su *Objeción Parcial al Informe de Inspección*.[8] Expuso que se oponía al *Informe* solo en cuanto al "estimado" de $102.00 a $130.00, toda vez que se trataba de una valoración que no solo era altamente especulativa, sino incorrecta *vis a vis* el costo verdadero de la reparación. Al día siguiente, el 29 de noviembre de 2023, AUTOCENTRO presentó su *Moción Objetando Informe y Solicitando Comparecencia de Inspector*.[9] En esencia, señaló que el *Informe* contenía especulaciones y/o señalamientos infundados, y no detallaba ni describía los esfuerzos realizados para determinar si los códigos de diagnóstico encontrados surgieron antes o después del supuesto evento de sobrecalentamiento. Por otro lado, refutó el señalamiento del "undervoltage", por el *Informe* no contener hallazgos en cuanto al estado de la batería del auto, más aún cuando surge que estuvo un tiempo varado, sin tomar en consideración los efectos de la vida útil de cualquier batería instalada.

Luego de varios trámites administrativos, el 16 de enero de 2024, DACo desestimó la *Querella* en contra de PENTAGON.[10] Entonces, el 26 de febrero de 2024, el DACo determinó *Citación a Vista Administrativa* pautando audiencia para el 4 de abril de 2024 a la 1:00 de la tarde.[11]

Llegado el día de la audiencia señalada, 4 de abril de 2024, comparecieron ambas partes acompañadas de sus respectivas representaciones legales. En la audiencia, solo testificó el señor GARCÍA ALICEA.

El 13 de junio de 2024, DACO intimó la *Resolución* impugnada. En la misma, se consignó las siguientes determinaciones de hechos:

---

[8] Apéndice de *Recurso de Revisión Judicial*, págs. 46- 48.
[9] *Íd.*, págs. 49- 51.
[10] *Íd.*, págs. 52- 54.
[11] *Íd.*, págs. 55- 58.

1. El 30 de enero de 2023, el Querellante adquirió mediante compraventa de la Querellada un vehículo de motor usado marca BMW, modelo 4 Series del año 2022, de número de serie WBA4J1C59KBM16614 (en adelante el Vehículo), a un precio convenido de $33,000.00. el Vehículo tenía 57,660 millas corridas al momento de su compraventa.

2. Debido al millaje, el Vehículo objeto de la Querella no contaba con garantía de fábrica, la cual es de 4 años o 50 mil millas lo que ocurriera primero.

3. Al momento de la compraventa del Vehículo, el vendedor de la Querellada, el Sr. Marcus Gonzáles Reyes, (en lo sucesivo el Vendedor) le informó al Querellante que el Vehículo estaba en excelentes condiciones. Además, le informó al Querellante que el Vehículo contaba con garantía, pero nunca precisó la duración de la garantía o sus limitaciones. Tampoco le entregó al Querellante copia del Reglamento 7159 del Departamento, conocido como Reglamento de Garantías de Vehículos de Motor.

4. Al momento de la compraventa del Vehículo, el Querellante pagó a la Querellada un pago en concepto de tablilla, registro o traspaso por la cantidad de $299.00. Este cargo surge del Contrato de Compraventa del Vehículo identificado como un cargo por concepto de "Trámites Inscripción de Deuda".

5. Al momento de la compraventa del Vehículo, el Querellante perfeccionó un contrato de financiamiento de auto con Pentagon Federal Credit Union (en adelante "PFCU"), por un término de 72 meses, con 1 primer pago de $563.43 y 71 pagos de $562.99, bajo el *Account Number* 33850870818.

6. Separado al pago mensual de PFCU, el Querellante pagó el costo del seguro del auto con la aseguradora, Universal Insurance Company, a un costo de $850.00 anual.

7. El 26 de mayo de 2023, mientras el Querellante conducía, el Vehículo se apagó. Antes de apagarse, el Vehículo no mostró ningún aviso de fallo en su tablero de instrumentos ("dashboard"), ni alguna otra señal de fallo o humo. Luego de apagarse, el tablero de instrumento ("dashboard") hizo un sonido como de fuga de gases en el área del motor y comenzó a iluminar distintos avisos de fallo, incluyendo el "check engine", temperatura alta, entre otros. Acto seguido, el Querellante se comunicó con el Vendedor, para solicitarle un servicio de grúa para llevar el Vehículo a las facilidades de la Querellada para que fuera reparado bajo garantía. Sin embargo, el Vendedor le comunicó al Querellante que la garantía había expirado, por tratarse de un Vehículo usado y la cantidad de millas que había recorrido al momento de la compraventa la garantía era de dos (2) meses, y por tal razón la Querellada no le extendería servicio o reparación al Vehículo.

8. Posteriormente, el Querellante llevó el Vehículo a Autogermana para diagnóstico y verificación. Sin embargo, el Querellante no autorizó la reparación del motor del vehículo.

9. El 12 de junio de 2023, el Querellante le envió una comunicación a la Querellada titulada "Notificación de último intento de reparación de vicios ocultos y aviso interruptor" (en lo sucesivo "Notificación"), mediante correo certificado con acuse de recibo. En la misma, le comunicó a la Querellada que desde 26 de mayo de 2023 se había visto privado del uso y disfrute del Vehículo debido a defectos en su motor y/o su sistema de enfriamiento del motor, añadiendo que, a pesar de las solicitudes de servicio realizadas, en todo momento se habían negado a reparar el Vehículo y/o a cumplir con el deber

de sanear los vicios ocultos de la unidad. Mediante la Notificación el Querellante le extendió a la Querellada "*una última oportunidad de reparación de los defectos (vicios ocultos) del Vehículo*", exigiendo que la Querellada coordinara la visita de última oportunidad de reparación "*dentro del término de diez (10) días*".

10. La Notificación enviada por el Querellante a la Querellada culmina haciendo hincapié en que: a) tratándose de la última oportunidad de reparación que les extenderé para reparar los vicios ocultos y ajustar el vehículo a su garantía, si no responden a la presente carta o si después de la vita de servicio que coordinen como consecuencia de esta carta el Vehículo continúa presentando los defectos mecánicos, daré por cancelado el contrato de compraventa y exigiré se me reembolse el dinero pagado por la unidad"; y b) "es la intención del presente documento que se tome como uno que interrumpe cualquier término prescriptivo establecido en el estado de derecho actual."

11. La Querellada recibió la Notificación certificada del Querellante el 23 de junio de 2023. Sin embargo, no contestó la misma dentro del término de los diez (10) días provisto por el Querellante.

12. El 7 de julio de 2023, el Querellante por conducto de su representación legal radicó ante este Departamento la Querella de epígrafe en una acción de saneamiento por vicios ocultos, solicitando la resolución del Contrato de Compraventa del Vehículo, la devolución de las prestaciones y el pago del balance del préstamo de Vehículo con PFCU, honorarios de abogado, daños y perjuicios, entre otros remedios.

13. El 31 de julio de 2023 el representante legal de la Querellada le cursó al Querellante una misiva por correo electrónico. En la misma, solicitó una serie de información al Querellante con el fin de "proceder con una evaluación adecuada de los reclamos" contenidos en la Notificación enviada por el Querellante. El Querellante no contestó dicha misiva.

14. Como parte del proceso administrativo, el 6 de noviembre de 2023, este Departamento citó a las partes para la realización de una inspección del Vehículo. El Técnico de la Investigación asignado por este Departamento fue el Sr. José Torrón Martínez (en lo sucesivo el Técnico).

15. El Informe de Inspección del Departamento fue notificado a las partes de epígrafe y archivado en autos el 16 de noviembre de 2023.

16. El 28 de noviembre de 2023 el Querellante objetó parcialmente el Informe de Inspección. En su moción, la representación legal del Querellante se limitó a objetar el estimado de "diagnóstico general" de $102.00 a $130.00 que fuera consignado en el Informe, al no solo considerarlo altamente especulativo, sino incorrecta vis a vis el costo verdadero de la reparación del motor del Vehículo objeto de la querella.

17. El 29 de noviembre de 2023, la Querellada objetó el Informe de Inspección. En términos específicos, la Querellada objetó la opinión del Técnico de que "(a)parentemente el chofer [del vehículo] no tuvo advertencias por averías en el motor", y que los códigos de diagnóstico de "undervoltage" encontrados en la memoria del Vehículo pudieran ser por la "falta de una batería correcta con una vida útil viable". A juicio de la Querellada, estas dos opiniones son especulativas. Además, en cuanto a los códigos relacionados a la batería o voltaje del

Vehículo, la Querellada señala que el Informe no indica cual es el hallazgo en cuanto al estado de la batería, ni considera que el Vehículo "llevaba tiempo varado".

18. En aras de atender la objeción de la Querellada al Informe de Inspección sin la necesidad de la comparecencia del Técnico durante la vista administrativa, determinamos no considerar para los fines de la adjudicación las dos (2) partes del Informe que fueron objetadas de forma específica por la Querellada, citadas en el párrafo anterior.

19. El día de la Inspección del Vehículo llegó en una grúa, lleva tiempo sin utilizar y no funciona.

20. El motor del Vehículo no funciona, lo cual fue confirmado durante la Inspección realizada por el Técnico de este Departamento, no son meras imperfecciones menores, sino defectos graves y/o que exceden sustancialmente del tipo de imperfecciones menores que cabe esperar al comprar un Vehículo usado de concesionarios de autos.

21. El Querellante no ha podido utilizar su Vehículo por las averías en su motor desde el 26 de mayo de 2023. Sin embargo, el Querellante ha continuado realizando los pagos mensuales del préstamo realizado para la compra del Vehículo con el fin de proteger su empírica crediticia.

22. El Querellante ha sufrido daños económicos cuando ha pagado las mensualidades de un Vehículo, que no ha podido utilizar, verse en la necesidad de utilizar un vehículo prestado para poder asistir a su trabajo, esto ha provocado inconvenientes en su movilidad, gastos legales por la cantidad de $3,500.00, corajes y malos ratos ante la negativa de la Querellada atender su reclamación. El Querellante también ha pagado la cantidad de $850.00 por el seguro de un Vehículo, el cual no puede utilizar.

En desacuerdo, el 3 de julio de 2024, **AUTOCENTRO** presentó una *Moción de Reconsideración*.[12] Afirmó que erró **DACo** al concluir que: el coche adolecía de vicios redhibitorios; el señor **GARCÍA ALICEA** les brindó una "oportunidad razonable" para corregir los defectos; correspondía una cantidad en daños y perjuicios; y al realizar una determinación de temeridad en su contra. Posteriormente, el 9 de julio de 2024, el señor **GARCÍA ALICEA** presentó su *Oposición a que se Acoja Reconsideración o en Solicitud de Término*.[13] Allí, indicó que **AUTOCENTRO** intenta seguir alargando y posponiendo la culminación de un proceso adjudicativo, cuestionando la apreciación de la prueba y reafirmando argumentos previamente rechazados por **DACo**. Evaluadas ambas posturas, el 10 de julio de 2024, la agencia

---

[12] Apéndice de *Recurso de Revisión Judicial*, págs. 74- 88.
[13] *Íd.*, págs. 89- 90.

administrativa dispuso *Resolución en Reconsideración* declarando no ha lugar al petitorio.[14]

Inconforme con ese proceder, el 8 de agosto de 2024, **AUTOCENTRO** recurrió ante este Tribunal de Apelaciones mediante un *Recurso de Revisión Judicial.* En el mismo, señala el(los) siguiente(s) error(es):

> Erró el Honorable Departamento de Asuntos del Consumidor al determinar que el Vehículo Objeto adolecía de vicios redhibitorios.

> Erró el Honorable Departamento de Asuntos del Consumidor al determinar que la parte querellante brindó a Autocentro una "oportunidad razonable" para corregir los defectos.

> Erró el Honorable Departamento de Asuntos del Consumidor al no asegurar el debido proceso de ley de Autocentro y permitir que se le negara su derecho a preparar una defensa adecuada.

> Erró el Honorable Departamento de Asuntos del Consumidor al imponer cantidad alguna en daños y perjuicios a Autocentro, aun cuando no se cumplieron con los requisitos jurisprudenciales para que así lo hiciera.

> Erró el Honorable Departamento de Asuntos del Consumidor al hacer una determinación de temeridad en contra de Autocentro.

> Erró el Honorable Departamento de Asuntos del Consumidor al ordenar a la compareciente a pagar a Pentagon Federal Credit Union el balance del préstamo y a pagar a la parte querellante la suma de los pagos realizados por éste a la entidad financiera, y continuar con los procedimientos sin la presencia de la entidad financiera quien resultaba ser parte indispensable.

El 19 de agosto de 2024, pronunciamos *Resolución* en la cual, entre otras cosas, concedimos un plazo perentorio de treinta (30) días para presentar su alegato en oposición al señor **GARCÍA ALICEA**. En cumplimiento con lo anterior, el 30 de septiembre de 2024, el señor **GARCÍA ALICEA** presentó su escrito intitulado *Alegato en Oposición a Recurso de Revisión Administrativa*. En resumidas cuentas, razonó que el **DACO** sí contó con prueba sobre la naturaleza y magnitud del vicio del vehículo de motor, consistente en el *Informe* del técnico automotriz del **DACO**, contrario a lo alegado por **AUTOCENTRO** en su recurso. decidimos

El 10 de octubre de 2024, decidimos *Resolución* en la cual le

---

[14] *Íd.*, págs. 91- 93.

concedimos a **AUTOCENTRO** un término para presentar la transcripción de la prueba oral (TPO) de la audiencia celebrada ante el **DACO**. El 25 de noviembre de 2024, **AUTOCENTRO** presentó *Moción en Cumplimiento de Orden, Sometiendo y Notificando Transcripción de Vista Administrativa del 4 de abril de 2024.*

Después, el 8 de enero de 2025, **PENTAGON** acudió ante este Tribunal mediante *Comparecencia Especial en Torno a Recurso de Revisión* informando que no le fue notificado el recurso, por lo que no se perfeccionó el mismo. Calificada la comparecencia especial de **PENTAGON**, el 6 de febrero de 2025, mediante *Resolución* declaramos no ha lugar la petición de desestimación.

Evaluado concienzudamente el expediente del caso y contando con el beneficio de la comparecencia de todas las partes, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

- II -

- A - *REVISIÓN JUDICIAL*

La *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico* (LPAU) provee un cuerpo de reglas mínimas para gobernar los procesos de adjudicación y reglamentación en la administración pública.[15] Su sección 4.1 instituye la *revisión judicial* por este Tribunal de Apelaciones de las determinaciones finales de las agencias.[16]

La *revisión judicial* tiene como propósito limitar la discreción de las agencias y asegurarse de que estas desempeñen sus funciones conforme a la ley.[17] El criterio rector al momento de pasar juicio sobre una decisión de un foro administrativo es la *razonabilidad* de la actuación de la agencia.[18]

---

[15] Conocida como la Ley Núm. 38 de 30 de junio de 2017, según enmendada, 3 LPRA § 9601-9713; *SLG Saldaña-Saldaña v. Junta*, 201 DPR 615, 621 (2018).

[16] 3 LPRA § 9671.

[17] *Torres v. Junta Ingenieros*, 161 DPR 696, 707 (2004). Véase, además Javier A. Echevarría Vargas, *Derecho Administrativo Puertorriqueño*, Ediciones Situm (2017), págs. 304– 306.

[18] *Fonte Elizondo v. F & R Const.*, 196 DPR 353 (2016); *Otero v. Toyota*, 163 DPR 716 (2005). D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativa Uniforme*, 2da ed., Bogotá, Ed. Forum, 2001, pág. 543.

Nuestra evaluación de la decisión de una agencia se circunscribe, entonces, a determinar si esta actuó de forma arbitraria, ilegal o irrazonable, o si sus acciones constituyen un abuso de discreción.[19]

Empero, las decisiones de los organismos administrativos especializados gozan de una presunción de legalidad y corrección, por lo que, sus conclusiones e interpretaciones merecen gran consideración y respeto.[20] Por ello, al ejecutar nuestra función revisora, este Tribunal está obligado a considerar la especialización y experiencia de la agencia, distinguiendo entre cuestiones de interpretación estatutaria —sobre las que los tribunales son especialistas— y cuestiones propias de la discreción o pericia administrativa.[21] Ello implica que los dictámenes de los entes administrativos merecen deferencia judicial.[22]

Ahora bien, tal norma no es absoluta. Nuestro más alto foro ha instaurado que no podemos dar deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.[23] Particularmente, concretó las normas básicas sobre el alcance de la *revisión judicial* al expresar:

> [L]os tribunales deben dar deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que, si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida.

Primordialmente, el alcance de la *revisión judicial* de las determinaciones administrativas se ciñe a determinar lo siguiente: (1) si el

---

[19] *Pérez López v. Depto. Corrección*, 208 DPR 656, 660 (2022).
[20] *Transporte Sonnell, LLC v. Junta de Subastas*, 2024 TSPR 82; 214 DPR ____; *Torres Rivera v. Policía de PR*, 196 DPR 606, 625- 626 (2016); *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 891 (2008).
[21] *OCS v. Point Guard Ins.*, 205 DPR 1005, 1028 (2020).
[22] *DACo v. Toys "R" Us*, 191 DPR 760, 765 (2014).
[23] *Torres Rivera v. Policía de PR, supra.*

remedio concedido por la agencia fue el apropiado; (2) si las determinaciones de hecho de la agencia están basadas en *evidencia sustancial* que obra en el expediente administrativo, y (3) si las conclusiones de derecho fueron las correctas.[24]

En cuanto a las determinaciones de hechos, estas serán sostenidas por los tribunales si están respaldadas por *evidencia sustancial* que surja del expediente administrativo considerado en su totalidad.[25] La *evidencia sustancial* es aquella relevante que una mente razonable puede aceptar como adecuada para sostener una conclusión.[26] Debido a la presunción de regularidad y corrección que cobija a las decisiones de las agencias administrativas, quien alegue ausencia de *evidencia sustancial* debe presentar prueba suficiente para derrotar dicha presunción.[27] Para ello "tiene que demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración".[28] De modo que no podrá basarse únicamente en simple alegaciones. A esto se le conoce como la norma de la *evidencia sustancial,* con la cual se persigue evitar sustituir el criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor.[29] Por lo tanto, aun cuando exista más de una interpretación razonable de los hechos, el tribunal debe dar deferencia a la agencia, y no sustituir su criterio por el de esta.[30]

De otro lado, las conclusiones de derecho de la agencia son revisables en todos sus aspectos, sin sujeción a norma o criterio alguno.[31] Así, debemos dar deferencia a las interpretaciones que los organismos administrativos

---

[24] Sección 4.5 de la LPAU, 3 LPRA § 9675; *OEG v. Martínez Giraud,* 210 DPR 79 (2022).
[25] *Rolón Martínez v. Supte. Policía,* 201 DPR 26, 36 (2018).
[26] *Otero v. Toyota, supra*, pág. 728.
[27] *Graciani Rodríguez v. Garaje Isla Verde,* 202 DPR 117, 128 (2019).
[28] *Gutiérrez Vázquez v. Hernández y otros,* 172 DPR 232, 244 (2007).
[29] *Pacheco v. Estancias,* 160 DPR 409, 432 (2003).
[30] *Íd.*
[31] *Rebollo v. Yiyi Motors,* 161 DPR 69, 77 (2004).

hacen de las leyes y reglamentos que administran. Es por ello que, ante casos dudosos, donde pueda concebirse una interpretación distinta de estas leyes y reglamentos, la determinación de la agencia merece deferencia sustancial.[32]

En resumen, si la decisión recurrida es razonable y se sostiene en la *evidencia sustancial* que obra en el expediente administrativo, procede su confirmación.[33] A *contrario sensu*, los tribunales revisores podemos intervenir con la decisión recurrida cuando no está basada en *evidencia sustancial*, o cuando la actuación es arbitraria, irrazonable o ilegal, o cuando afecta derechos fundamentales.[34] Del mismo modo, el Prof. Echevarría Vargas ha puntualizado que las decisiones de las agencias gubernamentales no deben ser "revocadas o modificadas salvo que conste una actuación arbitraria, ilegal o irrazonable".[35]

### - B - *DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR (DACO)*

La *Ley Orgánica del Departamento de Asuntos del Consumidor* creó al **DACo** como la agencia administrativa encargada de proteger y salvaguardar los derechos del consumidor.[36] En consecuencia, se implantó una estructura de adjudicación administrativa con plenos poderes para resolver las controversias ante su consideración y concesión de los remedios pertinentes conforme a derecho.[37] De esta forma, la Asamblea Legislativa le adjudicó la responsabilidad de velar por el cumplimiento de todas las leyes concernientes a los derechos de los consumidores.[38] Como parte del cumplimiento con su misión, se le facultó al secretario del **DACo** la promulgación del *Reglamento de Procedimientos Adjudicativos*.[39] Su propósito principal es "asegurar la solución justa, rápida y económica de las

---

[32] *Torres Santiago v. Depto. Justicia*, 181 DPR 969, 1002 (2011).

[33] *García Reyes v. Cruz Auto Corp., supra*, pág. 893.

[34] *Capó Cruz v. Jta. Planificación et al.*, 204 DPR 581 (2020); *JP, Plaza Santa Isabel v. Cordero Badillo*, 177 DPR 177 (2009).

[35] Echevarría Vargas, J. A., *Derecho Administrativo Puertorriqueño*, 5ta. ed. Rev., San Juan, Ed. Situm, 2023, pág. 340.

[36] Ley Núm. 5 del 23 de abril de 1973, según enmendada. 3 LPRA § 341b *et seq.*

[37] 3 LPRA § 342 e(d); *Ortiz Rolón v. Armando Soler Auto Sales, Inc.*, 202 DPR 689, 696 (2019).

[38] *Íd.*

[39] *Reglamento* Núm. 8034, Departamento de Asuntos del Consumidor. (Aprobado el 14 de junio de 2011).

querellas presentadas ante o por el Departamento y proveer un procedimiento uniforme para su adjudicación".[40]

A este tenor, el secretario del **DACO** creó el *Reglamento de Garantías de Vehículos de Motor* (*Reglamento*).[41] Este *Reglamento* rige la venta y/o servicios de vehículos de motor nuevos o usados en Puerto Rico. Uno de los propósitos principales de esta reglamentación es proteger a los consumidores que invierten en la adquisición de automóviles, y procurar que estos sirvan para los propósitos para los cuales fueron adquiridos, y tengan las condiciones mínimas necesarias para garantizar la protección de la vida y propiedad.[42]

En cuanto a la garantía de los vehículos de motor usados, la Regla 26 de dicho *Reglamento* enuncia:

> 26.1 – Se prohíbe vender un vehículo de motor usado sin garantía.
> 26.2 – Todo vendedor de vehículos de motor usados, concederá garantía, en piezas y mano de obra. Esta garantía será a base del millaje recorrido y según la siguiente escala:
>> [...]
>> **c) Más de 50,000 millas y hasta 100,000 millas – dos (2) meses o dos mil (2,000) millas, lo que ocurra primero.**[43]

En lo pertinente, la Regla 29.3 del aludido *Reglamento* 7159 prescribe las obligaciones del vendedor al proveer servicio de reparación en garantía a un vehículo de motor usado. Sobre la reparación de defectos, dispone que:

> El Departamento, **podrá a opción del consumidor, decretar la resolución del contrato o reducir proporcionalmente su precio de venta de acuerdo a las disposiciones del Código Civil de Puerto Rico** en aquellos casos en que el vendedor o su representante, dentro de los términos de la garantía, tuvo **oportunidad razonable** para reparar uno o más defectos, pero no quiso o no pudo corregirlos. Lo que constituye oportunidad razonable de reparar se determinará tomando en consideración las circunstancias particulares de cada caso.
> (Énfasis nuestro).[44]

---

[40] *Reglamento* Núm. 8034, Departamento de Asuntos del Consumidor. (Aprobado 13 de junio de 2011), pág. 1.
[41] *Reglamento* Núm. 7159, Departamento de Asuntos del Consumidor. (Aprobado 1 de junio de 2006), pág. 2.
[42] *Íd.*, págs. 1- 2.
[43] *Íd.*, pág. 26. (énfasis nuestro).
[44] *Íd.*, págs. 29- 30. *Ortiz Rolón v. Armando Soler Auto Sales, Inc., supra.* **El Código Civil de Puerto Rico de 2020 establece que la resolución total (del contrato) solo procede si la evicción o el defecto (de la cosa) recaen sobre un aspecto determinante para la adquisición del bien.** Por ejemplo, en caso de evicción, el comprador también tendría derecho al resarcimiento de daños sufridos, salvo que haya actuado con negligencia.

El *Reglamento* Núm. 7159 hace la salvedad de que ninguna disposición de este, limitará el derecho del consumidor para ejercer cualquier acción reconocida en las leyes de nuestro ordenamiento, así como aquellas sobre saneamiento por vicios ocultos o redhibitoria y otras reconocidas en el Código Civil de Puerto Rico.[45]

### - C - VICIO REDHIBITORIO Y SANEAMIENTO

En nuestro ordenamiento jurídico, todo vendedor está obligado a la entrega y saneamiento de la cosa objeto de la venta, aunque ignorase los defectos ocultos.[46] Lo cual conlleva que el vendedor tenga la obligación de garantizar al comprador la posesión pacífica y útil de la cosa vendida y a su vez, responder por los vicios o defectos ocultos que tuviere.[47] **El adquirente puede optar por reclamar la subsanación o reparación de los defectos, la entrega de un bien equivalente o resolver total o parcialmente el contrato.**[48] Para que proceda una acción de saneamiento por vicios ocultos, el Máximo Foro ha establecido que deben estar presente los siguientes requisitos: (1) el defecto de la cosa vendida no sea de conocimiento del adquirente; (2) dicha imperfección sea grave o suficientemente importante que haga que la cosa sea impropia para el uso que se le destinó; (3) dicho desperfecto sea preexistente a la venta; y (4) se ejercite la acción en el plazo legal de seis (6) meses contados desde la entrega de la cosa vendida.[49]

Cónsono con lo anterior, en *Ford Motor Co. v. Benet*, nuestro más Alto Foro sostuvo que procede una acción redhibitoria por vicios ocultos en vehículos de motor defectuosos, cuando el "**...comprador logra probar que el automóvil que compró no funcionaba en forma normal y que el**

---

Refiérase: 31 LPRA § 9853. (énfasis nuestro).

[45] *Íd.*, a la pág. 35.

[46] Art. 1261 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9851.

[47] Art. 1263 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9853.

[48] *Íd.*

[49] *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 890-891 (2008). En reiteradas ocasiones, el Tribunal Supremo de Puerto Rico ha resuelto que dicho plazo "comienza a transcurrir no desde la fecha de perfección del contrato, sino desde el momento que cesan las gestiones de inteligencia entre las partes". *Polanco v. Cacique Motors*, 165 DPR 156, 166 [citando a *Ferrer v. General Motors*, 100 DPR 246,256 (1971); *Casa Jaime Corp. v. Castro,* 89 DPR 702 (1963)].

**vendedor tuvo oportunidad de corregir los defectos y no pudo o no los corrigió".[50]**

En cuanto a la revisión sobre la apreciación de la importancia del defecto por el foro inferior, nuestro Tribunal Supremo reiteró que:

> [L]a apreciación de la importancia del defecto, para resolver la procedencia de la acción redhibitoria, es esencialmente una cuestión de hecho, justificándose, por lo tanto, **nuestra intervención con la discreción del juzgador sólo en aquellos casos que acusen una ausencia de prueba adecuada o la comisión de error manifiesto en su apreciación.[51]**

En ese contexto, un vicio redhibitorio se define como "el defecto oculto en el bien transmitido a título oneroso, existente al tiempo de la adquisición, que hace impropio al bien para su destino o disminuye de tal modo su utilidad que, de haberla conocido, el adquirente no le habría dado menor por él".[52] Al mismo tiempo, el ordenamiento jurídico considera también un vicio redhibitorio: (a) aquel especialmente acordado como tal por las partes; (b) aquel que el transmitente garantiza que no existe; y (c) la ausencia de calidad convenida. En ese sentido, **el transmitente responderá, aunque ignore la existencia del vicio redhibitorio.[53]**

Ahora bien, si por el contrario el defecto de la cosa no es de tal magnitud como para mermar su utilidad o habilitar la garantía por vicios redhibitorios, puede subsanarse mediante la doctrina del error. Es decir, en ese escenario, las partes podrían extender el concepto de defectos ocultos mediante pacto y subsanarlo.[54]

- III -

**AUTOCENTRO** argumentó que erró **DACO** al solventar que el vehículo de motor objeto de la *Querella* adolecía de vicios redhibitorios; al imponer

---

[50] 106 DPR 232, 238 (1977). (énfasis nuestro). Reiterado en *Polanco v. Cacique Motors, supra,* pág. 168.

[51] *García Reyes v. Cruz Auto Corp., supra.* [Citando a *García Rivera v. Ciudad Chevrolet, Inc.,* 110 DPR 158,162 (1980); *DACO v. Marcelino Mercury, Inc.,* 105 DPR 80,84 (1976)]. (énfasis nuestro).

[52] Art. 1267 del Código Civil de Puerto Rico de 2020, 31 LPRA § 9871.

[53] *Íd.* (énfasis nuestro).

[54] Refiérase: Miguel R. Garay: *Memorial Explicativo; Código Civil de Puerto Rico 2020 y su historial legislativo,* Ediciones SITUM., pág. 930 (2020).

una cantidad económica por daños y perjuicios aun cuando, según su criterio, no se cumplieron con los requisitos jurisprudenciales para que así lo hiciera; y al ordenar a **AUTOCENTRO** a pagar a **PENTAGON** el balance del préstamo sin la presencia de la entidad financiera como parte indispensable. Agregó que el señor **GARCÍA ALICEA** no presentó prueba alguna que estableciera los requisitos de la figura de vicios ocultos. A su vez, manifestó que no se le brindó la oportunidad al vendedor de corregir el vicio alegado. Enfatizó que se le hizo llegar una comunicación al señor **GARCÍA ALICEA** para coordinar una inspección por parte de los técnicos de **AUTOCENTRO**, pero que éste hizo caso omiso y se cruzó de brazos, prohibiéndoles evaluar y desarrollar su defensa.

Por su parte, el señor **GARCÍA ALICEA** planteó que le correspondía a **AUTOCENTRO** demostrar que en el expediente administrativo existía otra prueba que reducía o menoscababa el valor probatorio de la evidencia que impugnaba, al punto que se pudiera concluir que, ante la totalidad de la prueba, la determinación de la agencia no fue razonable. Resaltó que, en la audiencia, **AUTOCENTRO no** presentó prueba alguna. Tampoco evidenció que las condiciones defectuosas del vehículo respondían a actos atribuibles a su persona, o derrotaran la presunción establecida en el Código Civil. Del mismo modo, destacó que **AUTOCENTRO** tuvo la oportunidad razonable para reparar uno o más defectos, pero no quiso o pudo corregirlos. Completó que estos no presentaron testigos, y sus alegaciones fueron infundadas.

Justipreciada la *Transcripción de la Prueba Oral* (TPO) de la audiencia celebrada, el 30 de enero de 2023, el señor **GARCÍA ALICEA** adquirió un vehículo de motor usado en el concesionario **AUTOCENTRO MÁS**.[55] En específico, atestiguó que había adquirido el vehículo pues confió en la palabra del vendedor cuando le notificó que el "dealer" estaba libre de defectos y

---

[55] Véase, TPO del 4 de abril de 2024, pág. 11, líneas 23- 25; pág. 12, línea 25 y pág. 13, líneas 1-6.

vendían autos certificados.[56] El carro contaba con un millaje de 57,660 y un precio de $33,000.00.[57] Al momento de la compraventa, el vendedor de **AUTOCENTRO** le notificó que debía pagar el seguro del vehículo para poder llevárselo, así como el costo de la tablilla y traspaso.[58]

El señor **GARCÍA ALICEA** declaró que el 26 de mayo de 2023, aproximadamente cuatro (4) meses después de la compraventa, se encontraba saliendo de la tienda en la cual labora en Bayamón, y el vehículo se detuvo y se apagó sin aparecer aviso alguno en el panel de instrumentos.[59] Manifestó que cuando el carro se detuvo, escuchó un ruido "como de liberación de gas" y emanó un olor a aceite.[60] Aseveró que en ese momento se comunicó a **AUTOCENTRO** para solicitar que le repararan el automóvil, toda vez que le habían notificado que contaba con una garantía, pero no le ofrecieron detalles del tiempo del cual disponía.[61] Solo le indicaron que la garantía era "bumper to bumper" excepto en las piezas de desgaste.[62] Detalló que cuando llamó a **AUTOCENTRO** le notificaron que el vehículo ya había perdido la garantía, dado que habían pasado los tres (3) meses de la garantía.[63] Informó que no le hicieron ofrecimiento alguno para recibir el auto y repararlo.[64] Al no obtener la respuesta deseada, habló al servicio de grúa para llevar el vehículo a Autogermana BMW, para que le inspeccionaran el carro y le revelaran que tenía.[65]

Explicó el señor **GARCÍA ALICEA** que no le hizo ninguna reparación al auto por ser la cotización alta.[66] Costeó una grúa para que llevaran el vehículo

---

[56] Véase, TPO del 4 de abril de 2024, pág. 11, líneas 21- 25; pág. 13, líneas 2- 6.
[57] Véase, TPO del 4 de abril de 2024, pág. 13, líneas 24- 25; pág. 14, líneas 1- 14.
[58] Véase, TPO del 4 de abril de 2024, pág. 16, líneas 1-10. El seguro tuvo un costo de $850.00 y la tablilla $299.00.
[59] Véase, TPO del 4 de abril de 2024, pág. 18, líneas 1- 25; pág. 19, líneas 7- 13.
[60] Véase, TPO del 4 de abril de 2024, pág. 27, líneas 15- 19; pág. 28, líneas 20- 25.
[61] Véase, TPO del 4 de abril de 2024, pág. 20, líneas 22- 25; 21, líneas 1- 6; pág. 24, líneas 18- 21.
[62] Véase, TPO del 4 de abril de 2024, pág. 24, líneas 12- 25.
[63] Véase, TPO del 4 de abril de 2024, pág. 26, líneas 1- 3.
[64] Véase, TPO del 4 de abril de 2024, pág. 26, líneas 5- 14.
[65] Véase, TPO del 4 de abril de 2024, pág. 29, líneas 16- 25.
[66] Véase, TPO del 4 de abril de 2024, pág. 29, líneas 22- 25.

de motor a su hogar.[67] Exteriorizó que posterior a lo sucedido, optó por educarse en la página de **DACo**, y envió una carta certificada a **AUTOCENTRO** para poder resolver la situación de la manera más económica y rápida posible.[68] En la misiva, enviada el 12 de junio de 2023, le concedió un plazo de diez (10) días para que le notificaran la posibilidad de reparar el vehículo. Sin embargo, no recibió ninguna contestación de **AUTOCENTRO**.[69] El señor **GARCÍA ALICEA** reveló que, desde el 26 de mayo de 2023, no le ha podido dar uso al vehículo porque no enciende. De igual manera, reconoció que ha tenido que incurrir en gastos económicos para poder moverse y para su representación legal.[70] Comunicó que le prestaron un automóvil en su trabajo; no ha salido para ningún sitio; ello ha tenido un impacto en su vida personal dado que no puede salir a hacer mucho, y solo va a su lugar de trabajo.[71]

A preguntas del Juez Administrador, confirmó que el *Reglamento de Garantías de Vehículos de Motor* no le fue provisto; y los únicos documentos que le fueron entregados el día de la compraventa fueron: la orden de compra y el contrato con PenFed.[72]

En el contrainterrogatorio, aclaró que recibió una respuesta de **AUTOCENTRO** luego de radicada la *Querella*. La carta está fechada el 23 de junio de 2023, pero fue depositada en el correo el 31 de julio de 2023.[73]

A la luz de lo anterior, **DACo** concertó su determinación y concluyó que se trataba de un caso de saneamiento por vicios ocultos por ser una situación donde surge con meridiana claridad del expediente, que el vehículo parecía funcionar al momento de la transacción; manifestado el defecto o

---

[67] Véase, TPO del 4 de abril de 2024, pág. 34, líneas 7- 9. El señor **GARCÍA ALICEA** utilizó grúa para transportar el vehículo a Autogermana, y de ida y vuelta a **AUTOCENTRO** para su inspección por el técnico automotriz de **DACo.** Véase, TPO del 4 de abril de 2024, pág. 43, líneas 13- 18.

[68] Véase, TPO del 4 de abril de 2024, pág. 35, líneas 11- 25.

[69] Véase, TPO del 4 de abril de 2024, pág. 38, líneas 4- 25.

[70] Véase, TPO del 4 de abril de 2024, pág. 39, líneas 1- 25; pág. 40, 1- 16; pág. 47, líneas 13- 25; pág. 43, líneas 13- 18.

[71] Véase, TPO del 4 de abril de 2024, pág. 47, líneas 16- 24.

[72] Véase, TPO del 4 de abril de 2024, pág. 48, líneas 23- 24; pág. 49, líneas 1- 18.

[73] Véase, TPO del 4 de abril de 2024, pág. 55, líneas 11-20; pág. 59, líneas 10- 14.

vicio **AUTOCENTRO** no quiso corregirlo y, de haber conocido el defecto, el señor **GARCÍA ALICEA** no lo habría adquirido.

Por estar íntimamente relacionados, discutiremos los señalamientos de error en conjunto. En conformidad con la jurisprudencia, el señor **GARCÍA ALICEA** sólo está obligado a demostrar que, al momento de la compraventa, el vehículo de motor funcionaba normalmente, y **AUTOCENTRO** no quiso o no pudo corregir el o los defectos a pesar de haber tenido la oportunidad de hacerlo.[74] Veamos.

El señor **GARCÍA ALICEA** atestó que antes de ejecutar la compraventa del vehículo de motor, el vendedor de **AUTOCENTRO** le garantizó que el "dealer" estaba libre de defectos y vendían autos certificados.[75] Además, precisó que confió en la palabra del vendedor, el cual realizaba ventas de carros certificados, pero meses más tarde se le dañó.[76] De igual manera, confirmó que al momento de la compraventa, el vehículo tenía 57,660 millas.[77] El *Informe de Inspección* apuntó que el millaje al momento de la inspección era de 63,646 millas. En este caso, es evidente que, desde el momento de la compraventa hasta el día de los hechos aquí expuestos, el vehículo no sufría de ningún desperfecto, e incluso estaba siendo utilizado sin tener que realizarle mantenimiento alguno.[78]

El señor **GARCÍA ALICEA** aseguró que el día en que se le quedó su carro conversó con personal de **AUTOCENTRO** para que lo repararan y le informaron que había vencido la garantía.[79] Posteriormente, el 12 de junio de 2023, remitió una misiva, por correo certificado con acuse de recibo, a

---

[74] *Polanco v Cacique Motors, supra,* reitera que "el comprador de un vehículo de motor – sea este nuevo o usado – al reclamar por vicios ocultos **solo vendrá obligado a demostrar que el automóvil funcionaba normalmente al momento de la compra y que el vendedor no quiso o no pudo corregir el defecto, a pesar de haber tenido la oportunidad de hacerlo**. (énfasis nuestro).

[75] Véase, TPO del 4 de abril de 2024, pág. 11, líneas 21-25; pág. 13, líneas 2- 6. El término de autos certificados implica que ha sido el mismo ha inspeccionado y reacondicionado por el concesionario.

[76] Véase, TPO del 4 de abril de 2024, pág. 13, líneas 2- 6.

[77] Véase, TPO del 4 de abril de 2024, pág. 14, líneas 1- 3. Ello surge también del *Contrato de Compra/Venta*. Apéndice de *Recurso de Revisión Judicial,* pág. 21.

[78] Véase, TPO del 4 de abril de 2024, pág. 71, líneas 1- 3.

[79] Véase, TPO del 4 de abril de 2024, pág. 26, líneas 1- 3.

**AUTOCENTRO** concediendo un plazo de diez (10) días para auscultar la posibilidad de la reparación. **AUTOCENTRO** no quiso o no pudo corregir el defecto o vicio a pesar de haber tenido la oportunidad de hacerlo. Ante la inacción, el 7 de julio de 2023, acudió ante el **DACo.**

Por lo tanto, coincidimos con la apreciación de **DACo** sobre el(los) hecho(s) de que: (i) el vehículo BMW serie 4 tenía vicios ocultos o defectos que mermaron o imposibilitaron su uso; (ii) **AUTOCENTRO** tuvo la oportunidad, en dos (2) ocasiones, de reparar la unidad concernida y no fue hasta luego de presentada la *Querella* que contestaron la comunicación cursada por el señor **GARCÍA ALICEA;** y (iii) el señor **GARCÍA ALICEA** instó su *Querella* dentro del plazo dispuesto por ley.

Más aún, y según impone el *Reglamento 7159*, es responsabilidad de **AUTOCENTRO** vender un automóvil que tuviera las correspondientes inspecciones que requiere la *Ley de Vehículos y Transito de Puerto Rico*.[80] Así como, entregar el certificado de garantía y copia del *Reglamento 7159*, sin costo alguno.[81]

Escudriñado minuciosamente el expediente, así como la *Transcripción de la Prueba Oral* (TPO), no encontramos indicador alguno que refleje que el **DACo** hubiese actuado de manera arbitraria, ilegal o irrazonable, o si sus acciones constituyen un abuso de discreción. Contrario a ello, denotamos que del expediente emana la existencia de suficientes elementos que nos llevan a concluir que esta decisión administrativa está sustentada y/o avalada por *evidencia sustancial* del expediente administrativo y la credibilidad merecida del testimonio del señor **GARCÍA ALICEA**. Por lo cual, discernimos que la agencia apelada no incidió en los errores.

---

[80] Véase, Regla 31 del *Reglamento* Núm. 7159. Nuestro Código Civil de Puerto Rico de 2020, en su Artículo 1287 (c), instituye que cuando un defecto principal se descubre dentro del período de la garantía, se presume que el defecto estaba ya presente en el momento que el riesgo pasó al comprador.

[81] Véase Reglas 7 y 38 del *Reglamento 7159*.

No subsiste razón alguna, de hecho, o de derecho, que nos persuada a intervenir y variar la determinación impugnada. Además, no se desprende de la *Revisión de Decisión Administrativa* alguna otra prueba o evidencia para rebatir la presunción de corrección que cobija el dictamen administrativo. Cónsono con lo anterior, somos del criterio de que la *Resolución* decretada por el **DACo** fue una apropiada. Así pues, brindamos la deferencia al organismo administrativo por su *expertise*; y nos abstenemos de intervenir dado que su decisión es una racional.

- IV -

Por los fundamentos antes expuestos, ***confirmamos*** la *Resolución* prescrita el 13 de junio de 2024 por **DACo**.

**Notifíquese inmediatamente.**

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

La Jueza Rivera Marchand concurre con el resultado sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones